CURRY and others, Assignees, etc., *v.* LLOYD and others.

*(District Court, W. D. Pennsylvania.   September 3, 1884.)*

1. BANKRUPTCY—EQUITY OF CREDITORS.
   Creditors can work out equities only through the rights of the parties where there is no fraud.
2. SAME—ERECTION OF DWELLING FOR SON—CHARGE ON LAND.
   A banker, at a time when he was entirely free from pecuniary embarrassment, and apparently possessed of abundant means of his own, without fraudulent or wrongful intent voluntarily erected a dwelling-house upon his son's land without request of the son, who innocently acquiesced in the gratuitous act of his father, believing him to be a man of great wealth.   The father suspended about the time the building was completed, in consequence of a general financial panic, and he was subsequently adjudged a bankrupt.   Upon a bill filed by his assignees, *held,* that the voluntary expenditure so made by the father was not a ground for charging the son or his land.
3. SAME—EQUITABLE RELIEF DECREEABLE UNDER GENERAL PRAYER.
   A bill in equity charged that, in pursuance of a fraudulent conspiracy between grantor and grantee to defraud the creditors of the former, a voluntary deed of conveyance of land was made and subsequent improvements put thereon by the grantor, and the specific prayers of the bill were that the deed be declared null and void as against the creditors of the grantor, and for the reconveyance of the land and an account of rents.   The proofs did not sustain any of the allegations of fraud, and it appeared that the deed of conveyance was for a valuable and adequate consideration. *Held* that, under the prayer for general relief, compensation for the value of the improvements was not decreeable.
4. SAME—DEALINGS BETWEEN PARENT AND CHILD.
   Business dealings between parents and children, or near relatives, are to be treated as are the transactions of other people, and if the *bona fides* thereof is attacked the fraud alleged must be proved.

In Equity.

*George M. Reade* and *George Shiras, Jr.,* for complainants.

*Samuel S. Blair* and *John M. Kennedy,* for respondents.

ACHESON, J.   For many years prior to the transactions out of which this litigation arose, William M. Lloyd was a banker of good financial repute.   He individually carried on the banking business under the style of Wm. M. Lloyd & Co., at Altoona, Pennsylvania, his place of residence, and in the name Lloyd & Co., at Ebensburg, Pennsylvania; and he was also a partner in the banking firms of Lloyd, Caldwell & Co., at Tyrone, Pennsylvania; of Lloyd, Huff & Co., at Latrobe and Greensburg, Pennsylvania; and of Lloyd, Hamilton & Co., at New York city.   His credit stood very high, and was undoubted until after the financial crisis which came upon the country in the fall of 1873.

On the thirtieth of October of that year he was compelled to suspend; his financial difficulties, it would seem, having their origin in the New York house.   He soon submitted a statement of his affairs to his creditors, who, at a general meeting, granted him an extension for one, two, three, and four years.   Such was the confidence felt in his ability to pay under the extension that his neighbors in large numbers became his guarantors in different sums, the aggregate amount being $425,000.   He resumed business on February 2, 1874.

He paid the first installment of his extended debts, but about the middle of August, 1875, suspended business a second time. On September 18, 1875, he executed a deed of voluntary assignment for the benefit of his creditors. On November 11, 1875, certain of his creditors filed a petition to have him adjudged a bankrupt, and he was so adjudged June 24, 1878. This suit is by his assignees in bankruptcy. The subject-matter of the bill is real estate, alleged to have been disposed of by Mr. Lloyd in fraud of his creditors, and personal estate, viz., mortgages, etc., alleged to have been transferred by him, either in fraud of his creditors or by way of unlawful preferential payments. The contest, however, is narrowed down to the real estate, the other claims having been abandoned, or not being pressed. The principal matter in controversy, and that to which most of the evidence relates, is a piece of land in the suburbs of the city of Altoona, having thereon erected a stone dwelling-house and other improvements. The *third* and *fourth* paragraphs of the bill concern this property.

The *third* paragraph, in substance, charges that William M. Lloyd, being insolvent, on November 11, 1871, made a fraudulent gift of said land, by deed of conveyance, to his son John Lloyd, one of the defendants, with intent to defraud his creditors, which gift John accepted, with the like fraudulent intent; and that the secret purpose of both was that John should hold the land for the benefit of William M. Lloyd and his family, or for the joint benefit of the father and son. The substance of the charge in the *fourth* paragraph is that William M. Lloyd, being insolvent, and acting in collusion with his son John, with intent to defraud his creditors, and in pursuance of a fraudulent agreement between him and John, erected a stone dwelling, with other improvements, upon said land, at a cost of from $40,000 to $50,000, "and that said conveyance was made, and the said large and valuable improvements put thereon, in order to prevent the just creditors of the said William M. Lloyd from having the benefit of the money expended in the purchase of the said land, and expended upon the buildings and in making the improvements put upon the said land." The specific prayers of the bill are that the deed of conveyance may be adjudged null and void, and John Lloyd be decreed to convey to the plaintiffs the land "and improvements thereon," and for an account of rents.

The answer traverses all the allegations of fraud; admits a conveyance on November 11, 1871, but denies that it was voluntary; alleges it was made in execution and performance of a contract between William M. Lloyd and John Lloyd, made in 1866, and sets up, in substance, the facts about to be stated.

In the year 1865 John Lloyd, then aged 24 years, who previously was a clerk in the banking-house of William M. Lloyd & Co., removed from Altoona to the state of Tennessee, where he settled and engaged in the business of farming and fruit culture, near the city of Nashville, upon a farm which he had bought with means given

him by his father. It cannot be doubted that the latter was then abundantly able to make such a gift, and the good faith of that transaction is unassailable. William M. Lloyd and John Lloyd both testify that in the year 1866 the former, who then owned nearly the entire stock of the First National Bank of Altoona, wrote to John proposing that he should give up his business in Tennessee and return to Altoona and take the cashiership of the bank, and, as an inducement to John to do so, offered to procure for and give him, in addition to his salary as cashier, the land here in question, and that John, by letter, accepted his father's proposition. These letters are not produced, but there is sufficient proof of their loss. And I may as well, at this point, say that it does not strike me as suspicious or surprising that they were not preserved, in view of the mutual confidence subsisting between the father and son. Moreover, after the deed was executed there was no reason for preserving them.

The testimony of the Lloyds, father and son, in respect to the contract between them, is corroborated by that of S. C. Baker. The land in controversy is part of the Beal farm, which William M. Lloyd, Thomas McCauley, and Mr. Baker jointly acquired in April, 1866; and these three were the grantors to John Lloyd in the deed of November 11, 1871, conveying him the land. Now, referring to that conveyance, Mr. Baker testifies: "Years before, there was an understanding between the three of us that William M. Lloyd was to have that property for his son John, who was then in the south." It is here worthy of mention that Thomas McCauley had died before the testimony in this case was taken. It is shown that as soon as John Lloyd could get ready to leave Tennessee he did so, and he returned to Altoona in the spring of 1867. He was immediately thereafter elected to the cashiership of the said bank, accepted the position, and entered upon the discharge of his duties, and has ever since continued in the cashiership.

The testimony of William M. Lloyd and John Lloyd is strongly confirmed by what occurred immediately after John's return to Altoona, and subsequently; the facts about to be stated being shown by indubitable evidence. About the first of April, 1867, John entered into exclusive possession of the land in question. The Beal mansion stood on the land, and John occupied it until the fall of 1867, when, finding the house uncomfortable on account of its dilapidated condition, he moved out. He then leased it to a tenant, and it was leased by him to successive tenants, who occupied it until some time in 1872. In 1868 he put a fence around the land, except on the side next his father's homestead property. Besides fencing, he ditched the land, and planted trees on it. His improvements, down to the date of his deed, (November 11, 1871,) had cost him from $1,700 to $2,000, while the rent he received was trifling. The land was assessed to John Lloyd in 1868 and thereafter, and the taxes paid by him, except that, by some mistake, it was omitted from the trien-

nial assessment of 1871, and no taxes were paid by any one on the land during that year and the two succeeding years. But afterwards it was assessed to and the taxes were paid by him. As early as 1870 this land appeared platted on a public map of the city of Altoona with John Lloyd's name thereon as owner. This map was in common use in the city of Altoona among conveyancers and others, and was hung up in public places. On the twenty-fourth and twenty-fifth of August, 1871, James L. Given, a surveyor, surveyed the land for John Lloyd, and on October 5, 1871, gave him a plat of survey showing the courses and distances, and the exact area, viz., 26 acres and 140 4-10 perches; and on November 11, 1871, William M. Lloyd, Thomas McCauley, and S. C. Baker executed and delivered to John Lloyd a deed for the land, according to the plat of Given's survey, for the expressed consideration of $4,719. In accounting with Thomas McCauley and S. C. Baker, his co-owners of the Beal farm, William M. Lloyd settled for this land at the same rate (with interest added) at which they bought the farm in the spring of 1866; a circumstance confirmatory of Baker's statement as to the early arrangement by which William M. Lloyd secured this piece of the farm for John, for the land had risen in value between 1866 and 1871. The parties state that the delay in executing the deed was due to mere neglect. The deed was recorded March 30, 1872.

The theory of the bill is that the conveyance of November 11, 1871, was not only a voluntary one, but covinous also; not constructively fraudulent merely, but actually so,—the intent of both father and son being thereby to cheat and defraud the creditors of the former. I am unable to accept this theory. The hypothesis is not only disproved by the direct evidence touching the transaction, but is entirely inconsistent with the surrounding circumstances. The credit of William M. Lloyd was then good and unquestioned. At no time did it stand higher. He was in no pecuniary trouble and apprehended none. His business was, at least apparently, prosperous. Of his actual financial condition I shall soon have occasion to speak. At present I content myself with saying that, whatever that condition really was, he undoubtedly believed himself to be a man of very great wealth; which was likewise John's belief. I am altogether convinced that the transaction of November 11, 1871, was thoroughly honest in intent. And had it been, as claimed, a mere gift of the land, it could not, at any rate, be successfully assailed for meditated bad faith. But it was not a gift. The conveyance was not a voluntary one, but was executed on the footing and in performance of the contract between William M. Lloyd and John Lloyd, the terms of which have been stated. That the consideration moving from John was a valuable one, and sufficient to sustain the contract, is too plain for argument. And whether the contract is referable to the letters which passed between the father and son in 1866, or is to be treated as resting in parol strictly, John's title dates back at least to the spring

of 1867, when, having broken up his business in Tennessee, he returned to Altoona, Pennsylvania, fulfilled his part of the contract, and in pursuance thereof took exclusive possession of the land. Upon the assumption of a mere parol contract, the proofs here in respect to the identity of the land, the terms of the contract, performance by the purchaser, the taking possession by him in pursuance of the contract, the continuance of that possession and the notoriety thereof, improvements made, assessment of taxes to and payment by the purchaser, are so direct, positive, express, and unambiguous as to take the case out of the statute of frauds under the most exacting of the authorities. *McGibbeny* v. *Burmaster*, 53 Pa. St. 332; *Milliken* v. *Dravo*, 67 Pa. St. 230. John, therefore, was clearly entitled to the specific performance of his contract, had his right to a deed been denied. But it was not questioned; and when the deed of conveyance of November 11, 1871, was executed and delivered, he had a perfect and unimpeachable title, whether his father was then solvent or insolvent.

We might, therefore, dispense altogether with any inquiry into the then financial *status* of William M. Lloyd, were it not for what occurred so soon afterwards, and which is shortly to be mentioned. Looking back after this lapse of time, it is very difficult, if not impossible, to determine with certainty what the actual financial condition of William M. Lloyd was on November 11, 1871. He himself testifies: "I was worth a half a million of dollars over all liabilities. It was not uncertain at that. I was fully informed of the facts;" and he fixes his then yearly income at $50,000. But Mr. Lloyd enters into no details, and his figures are in the nature of an estimate. A vast amount of testimony was taken to show the state of his affairs on November 11, 1871, and the case is loaded down with complex and contradictory financial exhibits having relation to that particular date. The expert witnesses—the accountants, representing the respective sides, who speak from a mere examination of the books of the several banking houses which Mr. Lloyd conducted or in which he had an interest—widely differ in their views. And when real estate is touched, there is a great diversity of opinion as to values among the witnesses, as might be expected. The aggregate of his debts, which in the main were to depositors and holders of certificates, was large,— in the neighborhood of $2,000,000. But the assets of the several banking concerns, as shown by the books, were also large; and upon the best judgment I can form from a study of the exhibits were in clear excess of all his debts, although not very largely so. But in addition to those assets Mr. Lloyd had other more strictly personal assets, such as real estate, stocks, bonds, etc., to a large amount. According to the defendants' evidence these personal assets greatly exceeded $500,000. No doubt the values placed by the defendants' witnesses on the real estate are extravagant; but, after all reasonable abatement, these personal assets were very large. And the evidence

leads me to the conclusion that on November 11, 1871, William M. Lloyd was entirely solvent.

In the spring of 1872 William M. Lloyd began the erection of a dwelling-house upon John's land, the 26-acre tract. His original purpose was to build at a cost not exceeding $10,000; but his son-in-law, Mr. Hutchison, persuaded him to change his purpose and employ an architect, who prepared a plan. The limit of cost which Mr. Lloyd then fixed was $15,000. Mr. Hutchison took charge of the erection of the building, and Mr. Lloyd gave little personal attention to the matter. The house proved to be a much more costly affair than he anticipated. It is described in the bill as "a large stone house, constructed in the most elegant and expensive architectural style, and finished in the most elegant, rich, extravagant, and expensive manner throughout the inner part of the building." The cost, including a stable, ran up to the sum of $49,770.59. When Mr. Lloyd's suspension occurred, in October, 1873, the house was well on towards completion. The materials necessary to complete it, although paid for afterwards, had already been contracted for, and were delivered, or ready for delivery, and the wood worked out. Mr. Lloyd got himself released from contracts for expensive gas-fixtures, and, so far as he could, from contracts for mantels. Upon his suspension the work was stopped, but was resumed in about two months; and in the middle of February, 1874, Maxwell Kinkead, Mr. Lloyd's son-in-law, moved into the house; and in the spring of 1874 William M. Lloyd and his wife went there to board with Mr. Kinkead.

I am satisfied from the evidence that William M. Lloyd entertained no purpose of building on John's land when the deed of November 11, 1871, was executed. The project was of a later conception. I am also convinced by the proofs that he put these improvements on John's land without his request and without consulting him. There was no agreement, arrangement, or understanding between the father and son in respect to them. It was a purely voluntary act on the part of William M. Lloyd. He himself entertained the purpose of making an exchange with John, and of giving him for his land the old homestead property, consisting of 19 acres of land; and, while the stone building was in progress, John was told by members of the family that his father entertained such purpose. In his testimony John says: "I suppose I would have exchanged if he had wanted me to." While these improvements were going on,—until his suspension, in October, 1873,—William M. Lloyd's credit continued unimpaired, and he was entirely free from financial embarrassment. I have no doubt both he and John speak the truth when they respectively testify that they then believed he was worth a half a million of dollars. The belief thus entertained by them must be taken into account in passing judgment on their conduct. It must be remembered, too, that the father and son had the utmost confidence in each other, and were not dealing as strangers would. The father assumed that the son would

make the exchange he himself had in contemplation, and John, with filial respect, acquiesced without question in what his father was doing. Their testimony explanatory of these transactions, and all the attending circumstances, lead me to reject the theory of a fraudulent collusion between them. To my mind the very character of these improvements repels the idea that William M. Lloyd intended to withdraw from his creditors the money invested therein. Had he meditated such a fraud it would have taken any other shape than this unproductive and wasteful expenditure of money; for that such it was, in that locality, the evidence plainly indicates. Thus, John Crown, the plaintiffs' witness, when asked by them, "What is a fair rental value of the stone-house property?" answered: "Forty or fifty dollars per month, if a man could be found who had sufficient means to pay it. If vacant to-morrow, it might stand idle a long time."

Without further elaboration, I content myself with saying that the conclusion to which the evidence has brought me is that in the matter of the improvements put upon John's land there was no fraudulent conspiracy between him and his father, as charged in the bill, nor any collusion or understanding whatever between them; and that these improvements were made by William M. Lloyd of his own will, without fraudulent intent towards his creditors, or any wrongful purpose, but innocently, under the belief that he was possessed of great wealth, and in the expectation that upon his request John would make an exchange of properties.

The object sought by the plaintiffs throughout this litigation has been the overthrow of the deed of November 11, 1871, as a voluntary and fraudulent conveyance. The specific prayer of the bill is for such relief, and to that end the evidence was directed, as was the argument of counsel. It was, however, suggested at the hearing that should John's title to the land prevail, still the plaintiff should have a decree for the value of the improvements put thereon by William M. Lloyd; and this is repeated in the brief of counsel, and some authorities cited to support that view. This subject has received from me the most serious consideration, with a result unfavorable to the plaintiffs.

In the first place, it is plain that the bill was not framed with a view to any such relief. The case which it presents rests exclusively upon the fraudulent character of the deed and the consequent nullity of John's title. It has no other basis. The specific prayers of the bill are for a decree declaring the invalidity of the deed, decreeing a conveyance, and for an account of rents. True, there is the prayer for general relief. But the special relief prayed at the bar must essentially depend upon the proper frame and structure of the bill. Story, Eq. Pl. § 42. "In order to entitle a plaintiff to a decree under the general prayer different from that specifically prayed, the allegations relied upon must not only be such as to afford a ground for the relief sought, but they must have been introduced into the bill

for the purpose of showing a claim to relief, and not for the mere purpose of corroborating the plaintiff's right to the specific relief prayed, otherwise the court would take the defendant by surprise, which is contrary to its principles." 1 Daniel, Ch. Pr. 386. Thus, where a bill was filed for the specific execution of a contract for the purchase of land, alleged to be evidenced by a written memorandum, and that allegation was not sustained by the proof, it was held that the plaintiff could not, under the prayer for general relief, obtain compensation for improvements upon the land. *Smith* v. *Smith*, 1 Ired. Eq. 83. And so, here, it seems to me that under the frame and structure of the bill compensation is not decreeable. *Herring* v. *Richards*, 1 McCrary, 577; S. C. 3 Fed. Rep. 439.

Again, upon the proofs, no just decree for the value of the improvements could be made. Their cost would by no means be the true standard. There can be no doubt that these large expenditures added no corresponding increase to the value of the land, but in a great degree were sunk. It is probable that a modest mansion, costing $8,000 or $10,000, would have added more value to the land than this pretentious structure.

But waiving these considerations, and assuming the question as properly arising upon the pleadings and proofs, upon what just principle could a decree be made against John Lloyd or his land for the value of these improvements? Cases there are in which the owner of land, standing by and permitting another to expend money in improving it, has, in equity, been deemed a delinquent, and been compelled to pay for the improvement. "But in these cases there is always some ingredient which would make it a fraud in the owner of the land to insist on his legal right." *Crest* v. *Jack*, 3 Watts, 239. What such ingredient is there here? John did not solicit his father to make these improvements, nor encourage him to do so, nor did William M. Lloyd act in ignorance in respect to the title, nor was he misled. If John had refused to make the exchange of properties which his father had had in contemplation, there might possibly be some ground for raising an equity against him. But John was never asked to make the exchange; nor do the plaintiffs propose anything of that kind. Indeed, it would seem such exchange would have secured no advantage to William M. Lloyd, or his estate in bankruptcy, for the plaintiffs' counsel in their printed brief, at page 28, say: "The old mansion house, with the nineteen acres surrounding it, is nigher the center of the city and quite as valuable as the new stone house and the 26 acres."

Says Chief Justice GIBSON in *McClure* v. *McClure*, 1 Pa. St. 378: "Expenditure in improvements without stipulation or request is gratuitious, and, like any other unsought service, not the subject of compensation by bill or action." And in *Rush* v. *Vought*, 55 Pa. St. 438, 444, the court declare: "Equity will enforce a trust or a contract, but cannot create a title where none exists. * * * Creditors can

work out equities only through the rights of the parties where there is no fraud."

Our case is one of gratuitous expenditures innocently made. The cases which the plaintiffs' counsel cite are very different. In *Athey* v. *Knotts*, 6 B. Mon. 29, there was not only an ingredient of bad faith, but the interest which the creditors of the fraudulent insolvent reached, was his own portion of the rents. In *Divine* v. *Steele*, 10 B. Mon. 323, there was a request to make the improvement, and the insolvent himself had an enforceable claim. In *Lynde* v. *McGregor*, 13 Allen, 182, the wife had executed a mortgage of her land for three times the sum loaned, and the improvements were made by collusion between the husband and the mortgagee to defraud the creditors of the former, who, as I apprehend the case, sought to reach the improvements through the mortgage. At any rate, there was the element of actual fraud; and, if the wife was otherwise innocent, she had placed in the hands of the guilty conspirators a mortgage for a false amount.

The English authorities recognize this distinction: if a man, who afterwards becomes bankrupt, has advanced money to his son, in such a shape, or which has been applied to such purposes, that an *existing* lien in respect to that specific money so advanced can be made out, that *lien* will pass to the assignee in bankruptcy; but where the money has been advanced and disposed of in such a way as to raise no *lien*, then it cannot be reclaimed by the assignee. *Fryer* v. *Flood*, 1 Brown, Ch. 161; *Ex parte Shorland*, 7 Ves. 88, note, (Sum. Ed.)

In *Campion* v. *Cotton*, 17 Ves. 264, on a creditors' bill to set aside a settlement of land on a wife, where there had been subsequent voluntary expenditures by the husband in improvement by building and enfranchising copy-holds, the master of the rolls, Sir WILLIAM GRANT, after showing there was no ground to avoid the settlement, said:

"As to the *additional value* that the land may have received by building, subsequent to the marriage, or by enfranchising copy-holds, I do not see how it is possible to make a mere voluntary expenditure by him upon her estate a ground of charge against her or her estate."

No more can I see how it is possible justly to charge John Lloyd or his land for purely voluntary expenditures by his father, innocently made by him, and innocently permitted by the son. The heir, who after descent cast takes the accruing rents, is not accountable therefor to the creditors of his insolvent ancestor. *McCoy* v. *Scott*, 2 Rawle, 222. And in *Fripp* v. *Talbird*, 1 Hill, Eq. (S. C.) 142, where a voluntary deed was set aside as void against creditors, a decree for an account of profits enjoyed was refused; the court well saying: "It would operate as a hardship, approaching a fraud, to make one account for profits which he may have expended in the just confidence of their being his own." It would be a still harder thing to compel a son to pay for unsought expenditures gratuitously made by his father under the circumstances which existed here.

This opinion has so grown on my hands, in spite of all efforts to the contrary, that I must restrict myself to a mere statement of the facts, with my conclusions thereon, as respects the other subjects of controversy. The bill seeks to set aside, as fraudulent as against creditors, other deeds for other real estate,—three distinct properties. One of these is the Endress property. On May 8, 1871, Zachariah Endress conveyed a lot of ground, containing six acres, to William M. Lloyd for $10,500, of which $2,500 were paid, and notes given for the balance of purchase money. After Mr. Lloyd's suspension, Endress agreed to extend the time of payment upon John Lloyd's indorsing new notes, which was done. Afterwards, the property having greatly depreciated, William M. Lloyd proposed to Endress that he should take back the property and surrender the notes, which Endress declined to do. William M. Lloyd then sold and conveyed the property to John Lloyd for $8,000, John giving his notes therefor, bearing interest. Endress took these notes and surrendered William M. Lloyd's. At this time the property was not worth $8,000. Still later, John Lloyd's bargain being likely to prove a losing one, he prevailed on Endress to throw off $3,000, and take in cash $1,000 and notes of himself and John F. Bowman for the balance. These last-mentioned notes John Lloyd and Bowman paid with their own moneys. I discover no fraud in the affair. It is said the land has appreciated in value. But we must regard the state of things at the date of the transaction. If this had been a matter between strangers no one would have suspected fraud. But business dealings between parents and children, or near relatives, are to be treated as are the transactions of other people; and if the *bona fides* thereof is attacked, the fraud alleged must be proved. *Reehling* v. *Byers*, 94 Pa. St. 316.

The bill charges that John Cramer conveyed by deed four lots of ground in Altoona to William M. Lloyd for the consideration of $8,000, and that afterwards, on June 5, 1874, William M. Lloyd, John Lloyd, and John F. Bowman, conspiring together to defraud the creditors of the former, destroyed that deed, and procured a new one to be made from Cramer to John Lloyd, without any new or other consideration being made, and this for the purpose of fraudulently withdrawing the property from the reach of the said creditors. I find the facts to be these: By articles of agreement, dated April 22, 1873, John Cramer sold these lots to William M. Lloyd for $8,000, and on the agreement a payment of $2,667 is indorsed. In the spring of 1874 Cramer tendered a deed to Mr. Lloyd, and demanded payment of the balance of purchase money. He was unable to pay, and so informed Cramer. Mr. Tierney, a member of the bar, who was present at the tender on behalf of Cramer, testifies: "It was understood between Cramer and Mr. Lloyd, at the time, that, owing to his inability to pay, the articles of agreement or bargain was canceled." Cramer then sought a purchaser, and, failing to sell to Mr. C. Hauser, he offered the property

to John F. Bowman, who agreed to buy if John Lloyd would join him. This, John consented to do; and Cramer executed a deed to John Lloyd on June 5, 1874, for the price of $4,195, which was the then full value of the property, and, indeed, rather more than it was worth. It had greatly depreciated in value after the panic of 1873. John Lloyd and Bowman gave Cramer their notes for the price, and afterwards paid them with their own funds. Under the evidence, it is perfectly clear that the agreement of sale between Cramer and William M. Lloyd was rescinded by them *bona fide*. It appears that William M. Lloyd collected the rents until the fall of 1875, but it is shown that it was because Mr. Bowman requested him to do so, and pay the taxes. The charges in the bill in respect to this property are not sustained by the proofs. There is nothing shown to impeach the integrity of the transaction.

The remaining subject-matter of the bill is what is known as "The Unity Township Coal Property," situated in Westmoreland county, Pennsylvania, an undivided one-third of which William M. Lloyd sold and conveyed to John Lloyd on June 29, 1875, at the same time leasing to him another undivided third part. This coal property was purchased in 1872 by Lloyd, Huff & Co., a firm composed of William M. Lloyd and George J. Huff, and was paid for with the partnership funds, although the deed was made to Lloyd and Huff as tenants in common. On January 1, 1873, Lloyd, Huff & Watt succeeded the firm of Lloyd, Huff & Co., the only change being that of name and the introduction into the firm of William H. Watt. The new firm took the assets and assumed the debts of the old firm and continued the business. On June 10, 1875, Huff conveyed his interest in this coal property to William M. Lloyd. On June 29, 1875, William M. Lloyd conveyed an undivided one-third interest in the property to Watt, and at the same time made the above-recited conveyance and lease to John Lloyd. Simultaneously, John Lloyd and William H. Watt formed a copartnership, by articles of agreement, for the purpose of opening mines upon and mining coal from said property. William M. Lloyd, by a subjoined agreement under seal, consented to the said articles of copartnership. By the terms thereof, the profits due to the one-third interest of William H. Watt and due to the one-third interest of William M. Lloyd, leased to John Lloyd, were appropriated to the payment of the debts of Lloyd, Huff & Watt, and said two-third parts of the coal property were subjected to the payment of the debts of said firm, and were put into the new partnership impressed with the lien thereof.

For the undivided one-third interest conveyed to John Lloyd, he gave his promissory notes, aggregating $10,000: one for $2,500, payable in two years; and the others for $1,250, each payable in four, five, six, seven, and eight years, without interest. These notes William M. Lloyd immediately indorsed over to Lloyd, Huff & Watt, and delivered them to Mr. Watt, who then represented the creditors

of that firm, which had been granted an extension, and was in the hands of a committee of creditors. As the notes of John Lloyd matured, they were paid by him, and the proceeds have gone to the creditors of Lloyd, Huff & Watt.

The enterprise into which John Lloyd and William H. Watt embarked, involved the opening up of coal mines at a large expenditure of money, and they did thus expend from $10,000 to $12,000. Before the conveyance by William M. Lloyd to John Lloyd of the third interest in this property, some of the creditors of Lloyd, Huff & Watt were consulted by Mr. Watt, and they approved the sale. The price which John Lloyd gave, as represented by his notes, under the circumstances, was fair, and all the property was worth. The lease to John Lloyd, which was for 12 years, stipulated that no royalty should be payable to William M. Lloyd until the debts of Lloyd, Huff & Watt were paid. This disposition of the property was in the interest of the creditors of that firm, none of whom have complained of it. Although the title of the property was not conveyed to the partners as such, or for the use of the firm of Lloyd, Huff & Co., it was bought with the money of that firm. And while William M. Lloyd was not bound to devote it to the firm debts, still it was a proper and strictly equitable thing to do. Under all the circumstances, I fail to discover anything fraudulent in the transaction.

Let a decree be drawn dismissing the bill, with costs.